## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN E. BARTRUFF,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil No.   12-571-GPM-CJP** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

### REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge G. Patrick Murphy pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Bryan E. Bartruff seeks judicial review of the final agency decision terminating his Disability Insurance Benefits (DIB) benefits pursuant to **42 U.S.C. § 423**.

### Procedural History

In January, 1999, an ALJ issued a favorable decision granting plaintiff's application for DIB and finding that he had been disabled since August 1, 1993.   (Tr. 270-274).

In January, 2008, the Commissioner notified Mr. Bartruff that he had determined that his condition had improved and he was no longer disabled.   (Tr. 282-285).    After plaintiff's request for reconsideration was denied, an evidentiary hearing was held before Administrative Law Judge (ALJ) William L. Hafer.   (Tr. 406-430).   In a written decision dated September 20, 2010, ALJ Hafer found that Mr. Bartruff had experienced medical improvement such that he was no longer

disabled as of January 31, 2008.   (Tr. 18-25).   The Appeals Council denied review, and the

September 20, 2010, decision became the final agency decision subject to judicial review.   (Tr. 8).

Plaintiff has exhausted administrative remedies and has filed a timely complaint.

## **Issues Raised by Plaintiff**

Plaintiff raises two issues:

(1)     The ALJ failed to compare the current medical evidence with the medical evidence
        that predated the favorable 1999 decision, as required by the applicable regulations.

(2)     The ALJ's assessment of plaintiff's residual functional capacity (RFC) was not
        supported by substantial evidence.

## **Applicable Legal Standards**

In order to receive DIB, a claimant must be disabled within the meaning of the applicable

statutes.   For these purposes, a person is disabled when he or she has the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A).   "Substantial

gainful activity" (SGA) is defined as work activity that involves doing significant physical or

mental activities, and that is done for pay or profit.   Work may be substantial even if it is done on

a part-time basis.   20 C.F.R. §§ 404.1572.

Once a claimant has been awarded benefits, the agency undertakes a periodic review of

continued eligibility to receive benefits.   20 C.F.R. §§404.1589, 404.1594(a).   Social Security

regulations set forth a sequential eight-step inquiry to determine whether a claimant is under a

continuing disability. The eight steps are set forth in 20 C.F.R. §404.1594(f):

1. Is the beneficiary engaging in substantial gainful activity?   If yes (and there is
   no issue of a trial work period), the beneficiary is no longer disabled.

2. If the beneficiary is not engaging in substantial gainful activity, does his
   impairment or combination of impairments meet or equal the Listings?   If yes,

disability is continued.

3. If the beneficiary's impairments do not meet or equal the Listings, has there been medical improvement?   If yes, the sequential analysis proceeds to step four; if no, it proceeds to step five.

4. Is the medical improvement related to the beneficiary's ability to work,   i.e., has there been an increase in the residual functional capacity ?   If yes, the sequential analysis proceeds to step six; if no, it proceeds to step five.

5. If there is no medical improvement, or if the medical improvement is not related to the beneficiary's ability to work, does one of the exceptions to medical improvement apply?   If the exception does apply, the beneficiary is no longer disabled.   If none of the exceptions apply, the sequential analysis continues.

6. If medical improvement is related to the ability to work, are all current impairments severe in combination?   If not, the beneficiary is no longer disabled.

7. If the impairments are severe, the Commissioner determines the beneficiary's residual functional capacity (RFC),   and considers whether he can do his past work.   If the beneficiary can do his past work, disability will be found to have ended.

8. If the beneficiary cannot do his past work, the   Commissioner decides whether he can do other work given his RFC, and considering his age, education, and past work experience.   If the beneficiary can do other work,   he is no longer disabled; if not, disability is continued.

The continuing disability determination is to be made "on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition" and on a "neutral basis . . . without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."   42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(b)(6).

Medical improvement is any decrease in the medical severity of the beneficiary's impairment; the determination is based on improvement in symptoms, signs and/or laboratory findings.   20 C.F.R. § 404.1594(b)(1).   Medical improvement is related to ability to work if there

has been a decrease in the severity of the impairment(s) *and* an increase in the functional capacity to do basic work activities.   20 C.F.R. § 404.1594(b)(3).   The comparison point is the time of the most recent favorable medical decision that the individual was disabled or continued to be disabled.   20 C.F.R. § 404.1594(b)(7).   In this case, the comparison point used by the ALJ was January 23, 1999, the date of the most recent favorable decision that plaintiff was disabled.   (Tr. 19).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.     The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, the question before the Court is not whether Mr. Bartruff continued to be disabled as of the relevant date; rather, this Court must determine whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See,** ***Books v. Chater*****, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*****, 55 F.3d 300, 306 (7th Cir. 1995)**).   This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   ***Richardson v. Perales*****, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*****, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*****, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

-4-

**The Decision of the ALJ**

ALJ Hafer undertook the eight-step analytical process described above.   He determined that Mr. Bartruff was not engaged in substantial gainful activity and that his impairment did not meet or equal a listed impairment.   At steps 3 and 4, he determined that there had been medical improvement and that such improvement was related to plaintiff's ability to work.   Proceeding to step 6, he determined that plaintiff's impairment of degenerative disc disease was severe.   He determined that plaintiff had the RFC to perform a limited range of work at the sedentary level, and that this RFC would not permit him to do his past relevant work, which had been heavy.   At step 8, relying on the testimony of a vocational expert, the ALJ concluded that there were other jobs that plaintiff could perform.

**The Evidentiary Record**

The following summary is limited to the portions of the written record which are relevant to the issues presented.

**1.     Prior Favorable Decision**

On January 23, 1999, ALJ Andre Trawick, Jr., approved Mr. Bartruff's application for DIB, finding that he had been disabled since August 1, 1993.

Mr. Bartruff was born in 1961 and was 37 years old at the time of the prior decision.   ALJ Trawick found that Mr. Bartruff had severe impairments of degenerative disc disease, herniated disc at L4-5, status post three back surgeries, and severe back and leg pain.   He was hospitalized for severe back pain in August, 1993, and was discharged in a back brace with a diagnosis of bulging disc at L4-5.   A myelogram and CT scan showed herniation of that disc, and plaintiff underwent a discectomy at L4-5 in November, 1993.   That surgery had to be re-done in February, 1994.   A few months later, his pain returned.   A myelogram and CT scan showed nerve root

adhesion and possible herniated or bulging disc material.   A third surgery, consisting of laminectomy, foraminectomy and fusion, was done in October, 1995.   Thereafter, he participated in significant physical therapy, which improved his leg pain, but he continued to have back pain. ALJ Trawick found that plaintiff was limited to sedentary work and that he was limited by severe back pain.   Based on the testimony of a vocational expert, he concluded that plaintiff was unable to perform any job which existed in significant numbers in the economy. (Tr. 270-274).

**2.**      **Agency Forms**

In a Continuing Disability Review Report, dated August 31, 2007, Mr. Bartruff said that he was 5' 7" and weighed 150 pounds.   (Tr. 332).   He said he was unable to work because of a spinal fusion, moderate back pain and some light leg pain.   (Tr. 333).   He occasionally took Vicodin and Ibuprofen for back pain.   (Tr. 337).

Mr. Bartruff reported limited daily activities.   He said that he helped his children get ready for school in the morning and did light housework such as laundry, cooking and cleaning.   He mowed the lawn using a riding mower for short periods.   He said that he had to lie down several times throughout the day and could only stand or sit for short periods of time due to back pain. (Tr. 342-345).

**3.**      **Evidentiary Hearing**

Plaintiff was represented by an attorney at the hearing on May 5, 2010.   (Tr. 406).

Mr. Bartruff testified that, at times, his back pain was as bad as or worse than it had been right after the surgery.   Some days were better than others, but he was in pain all of the time.   (Tr. 413-414).   He could sit for 15 minutes to an hour.   Sitting, standing and twisting increased his pain.   (Tr. 414).

His doctor prescribed Vicodin, but he tried not to take too many.   He only took Vicodin if

his pain was extreme.   He did other things to relieve his pain, such as lying down or putting pillows between his knees.   (Tr. 416).   He also used a whirlpool and would lie on the floor with his legs propped up on a footstool.   (Tr. 420).   He did exercises which he learned in physical therapy.   He was unable to stand up straight.   (Tr. 421).   He was unable to sleep through the night due to pain.   (Tr. 422).

Plaintiff testified that he did light housework and light cooking, but he had to lie down after doing anything.   He drove to his mother's house to check on her every couple of days.   He went hunting for short periods of time, 30 minutes to an hour.   (Tr. 418-419).

Mr. Bartruff said that Dr. Bernardi did not recommend any more surgery.   The doctor told him that he has a "bad back," "a lot of degenerative disc disease," and "a lot of scar tissue."   (Tr. 422).

A vocational expert (VE) also testified.   The ALJ asked the VE to assume a person between the ages of 45 and 49 who could frequently lift 10 pounds, occasionally lift 20 pounds, was limited to 2 hours total standing, and who required a sit/stand option every 30 minutes. Further, the person could occasionally stoop, kneel, crouch, crawl and climb stairs, but could never climb ladders, ropes or scaffolding, work at unprotected heights or around dangerous machinery. The VE testified that this person could do the jobs of telephone information clerk, production inspector and hand sander, and that these jobs exist in significant numbers in the regional and national economies.   (Tr. 424-426).

The ALJ acknowledged that the RFC assessment given by Dr. Bernardi in his report of December 22, 2009, would be disabling.   (Tr. 424).

**4.**      **Medical Records Prior to January, 1999, Favorable Decision**

Plaintiff's back surgeries were done by Dr. Bernardi.   On March 15, 1996, five months

after the third surgery, Dr. Bernardi noted that it appeared that the sacral screw on the right side was fractured.   (Tr. 256).   In July, 1996, Dr. Bernardi felt that plaintiff had   solid bony union despite the broken screw.   (Tr. 249).

On September 5, 1997, prior to the last favorable decision, Dr. Bernardi noted that plaintiff was almost two years post L4 to S1 fusion with L5 nerve root decompression.   He had not taken any Vicodin since finishing the prescription that had been written six months earlier.   He was taking Darvocet only occasionally.   Mr. Bartruff said that he still got a fair amount of back pain after even light activity.   On examination, his neurologic exam was unchanged.   Motor strength was 5/5 in both legs.   X-rays showed no change in the alignment of the spine or in the position of the hardware.   Dr. Bernardi felt he was at maximum medical improvement, and asked him to return in six months.   (Tr. 241).

The last visit with Dr. Bernardi before the favorable decision was on March 10, 1998.   Dr. Bernardi again noted that there was x-ray evidence of a broken right S1 pedicle screw with a suggestion of pseudoarthrosis (i.e., nonunion) on the left side between L5 and the sacrum.   He wrote that this "would certainly be consistent with his fractured screw."   The doctor called the fractured screw "worrisome for a pseudoarthrosis" and discussed the possibility of additional surgery.   Mr. Bartruff told him that he "did not wish to risk losing the improvement he made with his recent operation."   The doctor termed this "a perfectly reasonable approach."   He concluded that plaintiff was doing "satisfactorily" and had reached "maximum medical improvement."   (Tr. 263).

## 5.      Medical Records After January, 1999, Favorable Decision

The transcript contains records of three visits with Dr. Bernardi between the ALJ decisions in January, 1999, and September, 2010.   In November, 2005, Dr. Bernardi noted that he had an

-8-

episode in the spring when he was pretty sore for two to three days after lifting a trash bag out of a truck.   Then, he returned to his baseline.   He had episodes in which his left buttock and back went numb, but he did not have pain or numbness in his legs.   He was taking only Ibuprofen.   Dr. Bernardi concluded that he was doing "very well" and that he had intermittent muscular low back pain.   No x-rays were taken.   He was to return in a year.   (Tr. 372).

In November, 2006, Dr. Bernardi noted that plaintiff had "one or two episodes of back pain" in the last year, which lasted for less than a week.   He also had more chronic discomfort towards the upper aspect of his incision.   On exam, his incision was healed and he had no deformities or spasms.   Straight leg raising was negative.   Motor power was full and equal in the lower extremities.   Deep tendon reflexes were symmetric.   X-rays showed solid-looking transverse process fusion from L4 to the sacrum.   He had degenerative facet disease at L3-4. There was a loss of disc height and slight spondylolisthesis at L3-4.   A lateral film showed the fractured sacral screw.   Dr. Bernardi concluded that he was doing "quite satisfactorily."   He was instructed to use local heat and ice if he had a flare-up of pain, and to begin taking a nonsteroidal anti-inflammatory on a regular basis.   (Tr. 370-371).

In November, 2007, physical examination showed tight paraspinal muscles on both sides and no tenderness to palpation over the low back.   Straight leg raising was negative and the hips were nontender.   Motor power was again 5/5 in the lower extremities with normal motor tone and no atrophy.   Deep tendon reflexes were 2/4 at the knees and ankles.   X-rays again showed a solid fusion from L4 to the sacrum.   The degenerative changes at L3-4 "may have progressed minimally."   Dr. Bernardi concluded that Mr. Bartruff was doing well clinically and that his current level of back pain was manageable.   He had no signs or symptoms of root compression. He was taking narcotics infrequently, and was taking Ibuprofen a little more regularly.   He was to

return in two years for reevaluation.   (Tr. 368-369).

On December 22, 2009, Dr. Bernardi completed a form   in which he set forth plaintiff's work restrictions.   The form says that the doctor last saw plaintiff in November, 2009, but there is no other record of that visit in the transcript.   For the diagnosis, Dr. Bernardi wrote "juxtafusional lumbar spondylolisthesis, low back pain, left L5 numbness, lumbosacral spondylosis, s/p lumbar fusion."   Dr. Bernardi indicated that Mr. Bartruff was off work with permanent restrictions of no lifting over 10 to 15 pounds, no repetitive bending or twisting of the lumbar spine, and he must be allowed to change positions every 3 hours for 30 minutes.   Dr. Bernardi also indicated that plaintiff was unable to work more than 3 hours without a 30 minute break in which he could lie down.   He wrote that plaintiff "is unable to consistently work" and would need "intermittent FMLA for 6 to 8 days per month."   Plaintiff was to return to see Dr. Bernardi in 2 years.   (Tr. 393).

**6.        State Agency Consultant RFC Assessments**

In January, 2008, Dr. C.A. Gotway assessed plaintiff's RFC based on a review of the record.   He opined that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk and for 6 out of 8 hours, sit for 6 out of 8 hours, and had unlimited ability to push/pull.[1] Dr. Gotway assessed nonexertional limitations as follows: no climbing of ladders, ropes or scaffolds, only occasional climbing of ramps and stairs, only occasional postural activities such as balancing and stooping, and need to avoid concentrated exposure to hazards such as machinery and heights.   (Tr. 377-384).

In August, 2008, Dr. E.C. Bone assessed plaintiff's RFC again.   His assessment was the same as Dr. Gotway's, except that he did not say that plaintiff should avoid exposure to hazards such as machinery and heights.   (Tr. 385-392).

---

[1] These are the exertional requirements of sedentary work.  20 C.F.R. §404.1567(a)

<u>**Analysis**</u>

Plaintiff first argues, correctly, that the ALJ's determination of medical improvement was erroneous because it was not based on a comparison of the prior and current medical evidence.

20 C.F.R. §404.1494(c)(1) states:

> Medical improvement is any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled and **is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s).**   [emphasis added].

ALJ Hafer's decision discussed only the "current medical evidence," i.e., the medical treatment that occurred after the prior decision finding him disabled.   ALJ Hafer did not compare the current medical evidence to the prior medical evidence in order to determine whether there had been medical improvement.

The parties have not cited a case from the Seventh Circuit discussing the requirement of comparison of prior and current medical evidence.   This Court's independent research has not found a case in which the Seventh Circuit explicitly held that such a comparison is needed. However, in **Blevins v. Astrue, 451 Fed. Appx. 583, 535 (7th Cir. 2011)**, the Seventh Circuit affirmed a finding of medical improvement where the ALJ compared the prior and current medical evidence.   **Blevins** cited **Delph v. Astrue, 538 F.3d 940 (8th Cir. 2008)**, in which the Eighth Circuit rejected plaintiff's claim that his condition had not improved because "A careful reading of the ALJ's decision reveals that he compared Delph's prior and current medical evidence to determine whether there have been changes associated with his impairment."   **Delph, 538 F.3d at 947**.   These cases suggest that a comparison of the past and current medical evidence is required.

The Commissioner does not argue that a comparison of past and current medical evidence is not required.   Indeed, it would be difficult to make that argument in the face of the clear

language of §404.1494(c)(1).   Further, he does not argue that ALJ Hafer did, in fact, make such a

comparison.[2]   Rather, the Commissioner engages in his own comparison of the prior and current

medical evidence and concludes that such a comparison supports the decision that medical

improvement has occurred.   See, Doc. 17, pp. 9-10.

    This Court cannot accept the Commissioner's argument.   It is well-settled that, in view of

the scope of judicial review of administrative agency action, a court cannot uphold an agency's

decision on grounds which the agency itself did not rely upon.   ***SEC v. Chenery Corporation***, **318**

**U.S. 80, 87-77 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010); *McClesky v.***

***Astrue***, **606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its**

**decision on a ground that the agency had not relied on in its decision....").**   The

Commissioner's after-the-fact comparison of prior and current medical evidence cannot be relied

upon to defend the ALJ's decision where the ALJ made no such comparison himself.

    Plaintiff's second point is also well-taken.   The ALJ's assessment of his RFC is not

supported by substantial evidence.   The ALJ rejected all of the medical opinions.   He rejected

Dr. Bernardi's opinion because it was not consistent with his office notes.   He rejected the state

agency consultants' assessments because the x-ray findings of "significant degenerative disc

disease of the lumbar spine" supported plaintiff's testimony that he could not stand or walk for

prolonged periods.   (Tr. 23).

    In his RFC assessment, the ALJ determined that plaintiff was able to sit for 6 out of 8 hours

with normal breaks, but was able to stand/walk for a total of only 2 hours.   (Tr. 20-21).   There is,

however, no evidence to support this finding.   Having rejected all of the medical opinions, the

ALJ appears to have formulated his own opinion as to the effects of plaintiff's degenerative disc

---

[2]  The Commissioner points out that Hearing Officer Clark did make some comparison of the past and current medical
evidence at the reconsideration level.   See, Doc. 17, pp. 1-2.   This is of no relevance to the issue presented, as the
reconsideration decision is not the final agency decision subject to judicial review.   As the Commissioner
acknowledges, it is ALJ Hafer's decision which is subject to review.   Doc. 17, p. 2.

disease.   This was error.   An ALJ may not "play doctor" by reaching his own medical conclusions, unsupported by any medical evidence.   ***Myles v. Astrue***, **582 F.3d 672, 677-678 (7th Cir. 2009)**.   See also, ***Barrett v. Barnhart***, **355 F.3d 1065, 1067-1068 (7th Cir. 2004)**, holding that the ALJ erred in determining that plaintiff could stand for 2 hours where no medical evidence supported that conclusion.

Without making any suggestion as to whether medical improvement has, in fact, occurred or as to what the decision should be on reconsideration, this Court concludes that this case must be remanded to the Commissioner for further proceedings.   There are only two avenues for remanding a social security case.   Remand can be ordered pursuant to sentence four or to sentence six of 42 U.S.C. § 405(g).   A sentence four remand depends upon a finding of error, and is itself a final, appealable order.   In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct. A sentence six remand is not an appealable order.   See, ***Melkonyan v. Sullivan***, **501 U.S. 89 (1991);** ***Perlman v. Swiss Bank Corporation Comprehensive Disability Protection Plan***, **195 F.3d 975, 978 (7th Cir. 1999).**

Here, a sentence four remand is appropriate.

## <u>Recommendation</u>

This Court recommends that the Commissioner's final decision be **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

Upon remand, judgment should be entered in favor of plaintiff.   ***Schaefer v. Shalala***, **509 U.S. 292, 302-303 (1993).**

Objections to this Report and Recommendation must be filed on or before January 28,

-13-

2013.

        **Submitted:   January 10, 2013**.

<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITD STATES MAGISTRATE JUDGE**